IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


DELOIS BUXTON, As Mother and Duly
Appointed Guardian of STACY BUXTON                                    PLAINTIFF

VS.                                              CIVIL ACTION NO.  2:02CV178KS-MTP

LIL' DRUG STORE PRODUCTS, INC.,
ET AL.                                                                DEFENDANTS


**MEMORANDUM OPINION AND ORDER**

This matter is before the court on a motion for summary judgment filed by defendants

Novartis Consumer Health, Inc. ("NCH"), Novartis Pharmaceuticals Corporation ("NPC") and

Lil' Drug Store Products Inc. (collectively, "defendants") and on defendants' motion to strike the

supplemental affidavit of Dr. Calvin Ramsey.[1]  From its review of all matters made a part of the

record of this case as well as applicable law, and being thus fully advised in the premises, the

court FINDS that defendants' motion to strike should be denied and that defendants' motion for

summary judgment should be granted.  The court specifically finds as follows:

FACTUAL BACKGROUND

This is a products liability action alleging injury arising out of the use of an over-the-

counter cough/cold product containing phenylpropanolamine ("PPA").  Plaintiff Delois Buxton

alleges that in February 1999, her daughter, Stacy Shanta Buxton suffered a heart attack and a

stroke as a result of taking Tavist-D, a product containing PPA and manufactured by defendant

---

[1] NCH, NPC and Lil' Drug Store Products Inc. are the only defendants remaining in the
case.

Novartis Consumer Health ("Novartis").[2]

The facts surrounding the tragic events that are the subject of this lawsuit are as follows: On February 20, 1999, plaintiff, then twenty-eight years old, took two doses of Tavist-D, the first at 10:30 a.m. and the second at 10:30 p.m., because she had been experiencing some congestion and flu-like symptoms for several days.[3]  Later that night, while out dancing at a nightclub, plaintiff collapsed on the floor unconscious.  She had not been drinking any alcohol that night. Upon arrival at the South Central Regional Medical Center ("SCRMC") Emergency Department at 12:55 a.m. on February 21, 1999, plaintiff was unresponsive and in cardiac and respiratory arrest, with no pulse or blood pressure.  The cardiac monitor showed that her heart was in ventricular fibrillation.[4]   Plaintiff was resuscitated for 45 minutes, intubated, and placed on a ventilator.  Following resuscitation, the cardiac monitor indicated that plaintiff was in third-degree heart block.

Upon initial examination in the emergency room, Dr. Lawrence Leader, (a Cardiologist who is also board-certified in Internal Medicine) indicated that plaintiff's primary problems

---

[2] Although the suit is brought by Delois Buxton, for convenience the court will refer to Stacy Shanta Buxton as plaintiff throughout this opinion.

[3] Plaintiff's medical records indicate that she visited the hospital a few days earlier, complaining of increasing dyspnea (shortness of breath) and chest pain.  She was diagnosed as having a viral-type illness.  For the following few days she continued to have a cough and other cold symptoms.  Plaintiff's medical records also show that on February 1, 1999, she visited the hospital complaining of congestion and other cold symptoms that she had been having for the past two weeks.  She was diagnosed with sinusitis and told to drink plenty of water and take Robitussin.

[4] Ventricular fibrillation is defined as "coarse or fine, rapid, fibrillary movements of the ventricular muscle that replace the normal contraction."  STEDMAN'S MEDICAL DICTIONARY 147129 (27th ed. 2000).

appeared to be cardiac in nature.  She was diagnosed with "cardiac arrest."  Dr. Leader also made

the following differential diagnoses:[5]

1.  Myocardial infarction
2.  Viral cardiomyopathy
3.  Pneumonia
4.  Diabetes[6]
5.  Leukocytosis
6.  Low platelets

At this time, Dr. Leader did not believe that plaintiff had a pulmonary embolism.[7]

Approximately ten hours after plaintiff was resuscitated, Dr. Aremmia Tanious, a

Neurologist, was consulted.  Dr. Tanious examined plaintiff and her records and diagnosed her as

having hypoxic/anoxic encephalopathy secondary to an episode of ventricular tachycardia

(above-normal heart rate) and fibrillation.[8]  As explained by both Drs. Leader and Tanious at

their depositions, hypoxic encephalopathy is when blood flow and oxygen are cut off to the entire

brain, causing generalized brain injury.  (In contrast, a stroke occurs when blood flow and oxygen

are cut off to one specific part of the brain, causing a focal brain injury.)  Dr. Tanious testified at

her deposition that hypoxic encephalopathy is commonly caused by cardiac arrest, respiratory

arrest or both.

_____

[5] Drs. Leader and Tanious both explained that this means that doctors list different possible causes for a particular condition and then try to eliminate one cause after another until the list is narrowed down as much as possible.  The length of the list varies by individual patient and the circumstances of the case.

[6] Plaintiff's medical records indicate that she has a history of diabetes.

[7] A pulmonary embolism is an obstruction or occlusion of the pulmonary arteries. STEDMAN'S MEDICAL DICTIONARY 127930, 127970 (27th ed. 2000).

[8] Dr. Tanious also opined that plaintiff may have had viral myocarditis (infected heart muscle).

None of plaintiff's friends or family who were with her at the hospital on February 21 told hospital personnel that plaintiff had taken Tavist-D and her medical records upon admission indicate that she had not taken any medications.

On February 24, 1999, a temporary pacemaker was inserted due to plaintiff's worsening heart function, and when plaintiff's heart rate had not improved by March 3, 1999, a permanent pacemaker was inserted.  Plaintiff's February 22, 1999 perfusion lung scan result was read to be "consistent with a high probability of pulmonary embolus."  Plaintiff underwent three separate CT Head Scans (on February 21, 22, and 25, 1999), all of which were negative, meaning that no abnormalities were seen and there was no evidence of bleeding or stroke.  In addition, several EEGs were performed by Dr. Tanious on plaintiff - on February 26, February 28, March 2, and March 16.  The impressions were described as consistent with diffuse cerebral dysfunction due to anoxic/hypoxic encephalopathy.

On the date of plaintiff's discharge, March 19, 1999 the principal diagnosis listed on the discharge summary is pulmonary embolism, with secondary diagnoses of prolonged CPR secondary to pulmonary embolism, hypoxic encephalopathy secondary to the prolonged CPR, third-degree atrioventricular block resulting in placement of permanent pacemaker, anemia, hypothyroidism, pneumonia and urinary tract infection.  The discharge summary explained that plaintiff's initial problem was thought to be a primary cardiac event secondary to cardiomyopathy.[9]  The discharge summary concluded that a pulmonary embolism caused plaintiff's cardiac arrest, and the resulting lack of oxygenated blood to the brain caused hypoxic

---

[9] Cardiomyopathy is disease of the heart muscle.  STEDMAN'S MEDICAL DICTIONARY 64460, 265340 (27th ed. 2000).

encephalopathy, or generalized brain damage.  Almost a year later, a January 2000 CT Scan conducted at the University of Mississippi Medical Center was again negative for stroke.

Plaintiff filed suit in Mississippi state court alleging that she sustained a heart attack and a stroke, and asserting numerous causes of action against various defendants.[10]  It is plaintiff's position that the PPA caused her to suffer a massive ischemic stroke[11] resulting in brain damage, while defendants' position is that plaintiff's brain damage was caused by a pulmonary embolism which in turn caused a cardiac arrest and then encephalopathy.

Defendants removed the case to this court on June 4, 2002.  Because this is one of thousands of product liability cases brought in courts against the country against various drug makers, alleging that PPA caused adverse medical events, all PPA federal cases, including the instant one, were consolidated and transferred for certain coordinated pretrial proceedings to the PPA Multidistrict Litigation ("MDL") pending in the Western District of Washington before Judge Barbara J. Rothstein.  These coordinated proceedings included fact discovery, as well as general causation expert discovery.  The instant case was transferred to the MDL on July 2, 2002.

In 2003, the MDL court conducted hearings regarding plaintiffs' experts' general causation opinions pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  On June 18, 2003, Judge Rothstein entered a comprehensive Order concerning the defendants'

---

[10] The Amended Complaint includes counts of negligence, breach of implied warranty of merchantability, breach of express warranty, strict liability, and punitive damages.

[11] Ischemic stroke results from the blocking of blood flow in a cerebral vessel, depriving brain tissue beyond the blockage of oxygen.  The vast majority of strokes are ischemic.  (The other type of stroke is hemorrhagic stroke which results from the rupturing of a blood vessel in the brain.  Hemorrhagic strokes account for fifteen to twenty percent of all strokes.)  *In re PPA Prods. Liab. Litig.*, 289 F.Supp. 2d at 1238, 1246.

5

motion to preclude plaintiffs' expert opinions as to general causation.  In her Order, Judge
Rothstein ruled that there was no scientifically reliable evidence of an association between PPA
and cardiac events and seizures, but that there was scientifically reliable evidence to support an
expert opinion on PPA's alleged causation of ischemic stroke.  *See In re Phenylpropanolamine
(PPA) Prods. Liab. Litig.*, 289 F.Supp. 2d 1230, 1251 (W.D. Wash. 2003).  Accordingly, the
court excluded plaintiffs' expert causation opinions related to injuries other than stroke,
including, specifically, cardiac injuries.  *See id.* ("[T]he court finds expert opinions as to a
relationship between PPA and cardiac injuries inadmissible under *Daubert*); *see also In re
Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL No. 1407, 2005 WL 1287814, at * 1
(W.D. Wash. May 31, 2005) (court's *Daubert* ruling precludes cardiac claims); Order Granting
Defendants' Motion for Summary Judgment Dismissal of Cardiac Injury Cases, *In re
Phenylpropanolamine (PPA) Prods. Liab. Litig.*, No. MDL 1407, 2-CV-1743, slip op. (W.D.
Wash. Oct. 24, 2003) (having excluded expert testimony regarding cardiac injuries, court granted
defendants summary judgment as to claims alleging solely cardiac injuries).

While this case was pending in the MDL, plaintiff unsuccessfully attempted to have the
case remanded to state court, and in connection with the briefing of remand issues, plaintiff
submitted an affidavit dated May 24, 2004 from Dr. Calvin Ramsey, a practicing physician who
is board-certified in Internal Medicine.  Dr. Ramsey personally examined plaintiff and reviewed
her medical records, but was not one of her treating physicians at the time of the events in
question.[12]  Dr. Ramsey also reviewed various articles and literature relating to the relationship

---

[12] The reason for submitting this affidavit was that in their opposition to plaintiff's motion
to remand, defendants averred that plaintiff did not have a stroke.  Judge Rothstein therefore
requested briefing from the parties on the question of whether this case was properly part of the

between PPA and ischemic strokes.  According to Dr. Ramsey, "based upon reasonable medical certainty and medical probability," it was his opinion that plaintiff's ingestion of Tavist D containing PPA "caused a massive vasoconstriction[13] of all arteries delivering blood to Ms. Buxton's brain, so as to totally deprive the brain tissue of oxygen and resulted in an ischemic stroke and permanent uniform brain damage."

The instant case was remanded to this court by order dated February 8, 2005 for case-specific discovery, other pre-trial matters and final disposition.  On June 13, 2006, defendants filed an order to show cause why this case should not be dismissed.  Specifically, defendants argued that plaintiff could not come forward with admissible expert testimony to demonstrate that she had a stroke, and that all the evidence in the record was to the contrary (*i.e.*, that plaintiff had some type of cardiac event leading to generalized brain damage).  Defendants argued that the only suggestion in the record that plaintiff had a stroke was Dr. Ramsey's affidavit which, for a number of reasons, could not meet the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert*.  In response to the motion, plaintiff submitted Dr. Ramsey's May 24, 2004 affidavit, as well as the deposition transcripts of plaintiff's treating physicians - her neurologist, Dr. Tanious, and her cardiologist, Dr. Leader.

Pursuant to this court's Scheduling Orders, plaintiff's expert designations were due August 1, 2006 and defendants' expert designations were served on September 15, 2006.  The only expert report served by plaintiff that addresses the issue of whether Ms. Buxton actually had

---

MDL proceeding if, in fact, plaintiff did not have a stroke.

[13] Vasoconstriction is narrowing of the blood vessels.  STEDMAN'S MEDICAL DICTIONARY 432200 (27th ed. 2000).

a stroke is an affidavit by Dr. Ramsey dated July 31, 2006.[14]  This affidavit is substantially

similar to Dr. Ramsey's May 24, 2004 affidavit .[15] .

By order dated April 5, 2007, this court deemed defendants' motion for an order to show

cause to be a motion for summary judgment and ordered plaintiff to either respond substantively

to the motion or to demonstrate that additional discovery was necessary, within ten days of the

order - *i.e.*, by April 19, 2007.  Plaintiff filed her response on April 16, 2007.  She filed a brief,

but did not file any new evidence in response to defendants' motion.

At approximately 5:00 p.m. on April 25, 2007 - the evening before defendants' reply

memorandum was due - plaintiff served a "Supplement to Designation of Experts and

Supplement to Response in Opposition to Defendant, Novartis', Motion for Summary Judgment"

containing a "Supplemental Report and Affidavit" of Dr. Ramsey.  The significant changes in Dr.

Ramsey's Supplemental Affidavit are as follows:  In paragraph 3, Dr. Ramsey added the second

and third sentences: "Ms. Buxton had no risk factors for the formation of a pulmonary embolism.

Ms. Buxton also had no risk factors for cardiac disease or dysfunction"; in paragraph 5, Dr.

---

[14] Plaintiff also submitted the report of Dr. James R. McDowell (board-certified in Neurology and Psychiatry).  Dr. McDowell was one of the generic causation experts in the MDL. Dr. McDowell did not opine that plaintiff suffered a stroke; rather, Dr. McDowell opined generally that PPA causes stroke.

[15] There are a few differences between the two affidavits.  First, on the list of materials reviewed by Dr. Ramsey, the phrase "[w]ill review Depositions of all Novartis employees and experts taken in the MDL proceeding" was removed in the second affidavit.  In addition, Dr. Ramsey changed his opinion in the earlier affidavit that the PPA *caused a massive vasoconstriction of all arteries* delivering blood to Ms. Buxton's brain" to "PPA...*caused or contributed to the cause of a massive vasoconstriction of arteries* delivering blood to Ms. Buxton's brain"  (emphasis added).  Finally, Dr. Ramsey added the following statement to the July 31, 2006 affidavit: "It is my opinion that Novartis knew or should have known about the potential of Tavist-D containing PPA to cause ischemic strokes and, as such, the label should have contained a clear warning to this effect**."**

Ramsey changes "arteries" to "more than one (1) of the cerebral arteries"; and paragraph 6 is entirely new and purports to rule out (for the first time) pulmonary embolism and/or a cardiac event in the absence of a stroke as the sole cause(s) of Ms. Buxton's generalized brain damage.[16]

On April 26, 2007, defendants moved to strike this supplemental report as untimely. This motion, as well as the motion for summary judgment, will be addressed below.

ANALYSIS

Motion to Strike

Rule 16(b) of the Federal Rules of Civil Procedure provides that the court shall enter a scheduling order limiting the time, *inter alia*, to complete discovery. The rule further provides that such an order "shall not be modified except upon a showing of good cause and by leave of the district judge." In addition, Fed. R. Civ. P. 6(b) provides that when an order of the court requires an act to be done at or within a certain time, the court "(1) with or without motion or notice order the period enlarged if request therefore is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permits the act to be done where the failure to act was the result

---

[16] Specifically, the new paragraph 6 provides: "It is my opinion that it is highly unlikely that a pulmonary embolism formed which caused this damage because Ms. Buxton had no risk factors for pulmonary embolism and because the lung perfusion test did not confirm the existence of this clotting. Even assuming the existence of a pulmonary embolism, it is highly probable that the pulmonary embolism formed <u>after</u> the ischemic stroke occurred. It is also my opinion that the brain damage was not caused by a spontaneous cardiac arrest. Ms. Buxton was a non-smoker, non hypertensive, healthy, active, twenty-eight (28) year old woman and had no family history of cardiac dysfunction. It is probable that after Ms. Buxton sustained a dramatic increase in blood supply to the brain, she sustained a massive ischemic stroke and the autoregulatory processes of the brain reacted in causing the heart to attempt to immediately pump more blood into the brain, which probably resulted in cardiac dysfunction, referred to as ventricular fibrillation. It is, therefore, my opinion that the ventricular fibrillation was secondary to this ischemic stroke" (emphasis added).

of excusable neglect...."   The Scheduling Order entered by this court required plaintiff to serve her expert reports by August 1, 2006, and no extension of this deadline was ever sought or granted.[17]   Pursuant to the Scheduling Order, plaintiff served her expert reports on July 31, 2006.

FED. R. CIV. P. 26(a)(2)(B) requires parties to serve expert disclosures containing "a complete statement of all opinions to be expressed and the basis and reasons therefore...."; *see also Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 569 (5th Cir. 1996) ("Rule 26(a) requires initial expert disclosure to be complete and detailed).  The purpose of this requirement is to "avoid the disclosure of 'sketchy and vague' expert information."  *Id.* (*citing* FED. R. CIV. P. 26 advisory committee's note).  FED. R. CIV. P. 26(e)(1) provides that parties are under a duty to supplement their disclosures or discovery responses where they learn that a prior response was incomplete or incorrect and the additional corrective information was not otherwise known to the other parties during the discovery process.[18]   In addition, that subsection provides that with respect to expert reports, any additions or other changes must be disclosed by the parties by the time their Rule 26(a)(3) pretrial disclosures are due (at least 30 days before trial, pursuant to Rule 26(a)(3)(C)).  And Rule 26.1(A) (5) of the Uniform Local Rules for the Southern District of Mississippi provides: "A party is under a duty to supplement disclosures at appropriate intervals pursuant to FED. R. CIV. P. 26(e) *and in no event later than the discovery cut-off established by*

---

[17] On August 10, 2006, this court entered an order staying all discovery pending resolution of the motion for an order to show cause.  The discovery deadline had been set for December 1, 2006.

[18] This requirement is reiterated in Rules 26.1(A)(2)(e) and 26.1(A)(5) of the Uniform Local Rules for the Southern District of Mississippi.

*the scheduling order*" (emphasis added).[19]

Defendants argue that plaintiff is seeking to skirt the disclosure requirements by characterizing the "new" opinions in Dr. Ramsey's Supplemental Affidavit as "supplemental." Courts have routinely rejected untimely "supplemental" expert testimony where the opinions are based on information available prior to the missed deadline for service of initial disclosures. *See*, *e.g.*, *Sierra Club,* 73 F.3d at 571 (purpose of supplemental expert report is to supplement - not extend the expert disclosure deadline); *Avance v. Kerr-McGee Chem. LLC*, 2006 WL 3484246, at * 7 (E.D. Tex. Nov. 30, 2006) (excluding late filed report where plaintiffs failed to demonstrate "substantial justification" why the revisions and new affidavits were filed after the expert deadline...."); *see also Cleave v. Renal Care Grp., Inc.*, 2005 WL 1629750, at * 1 (N.D. Miss. July 11, 2005) (excluding supplemental expert affidavit produced in response to summary judgment motion where plaintiff failed to identify new information which would prompt new opinions); *Salgado v. Gen'l Motors Corp.*, 150 F.3d 735, 741-43 (7th Cir. 1998) (affirming exclusion of "supplemental" expert testimony based on untimely disclosure because opinions were based on information available prior to the deadline for service of initial reports).

Courts have similarly made it clear that supplemental expert reports cannot be used to "fix" problems in initial reports. *See Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 258 (5th Cir. 1997) (affirming district court's refusal to allow late supplementation of expert reports and holding: "District judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case."); *Cleave*, 2005 WL 1629750,

---

[19] "The discovery deadline or cut-off date is that date by which all responses to written discovery shall be due according to the FEDERAL RULES OF CIVIL PROCEDURE and by which all depositions shall be concluded."  Local Rule 26.1(B)(1).

at * 1 ("A new expert affidavit which is submitted to rebut a summary judgment motion should

be stricken if the new opinion is differ from the earlier Rule 26 report."); *Beller v. U.S.*, 221

F.R.D. 689, 691-95 (D.N.M. 2003) (supplemental reports cannot be used to buttress opinions or

"shore up problems" in opinions contained in initial reports); *Brumley v. Pfizer, Inc.*, 200 F.R.D.

596, 603 (S.D. Tex. 2001) ("A subsequent expert affidavit submitted to rebut a summary

judgment motion may be excluded if it differs from an earlier Rule 26 report.").  As noted in

*Avance*:

> Even though the Federal Rules of Civil Procedure provide
> for supplementation, parties do not have infinite time to
> supplement their expert opinions with new information
> to respond to challenges to their experts' original evidence.
> Courts have stricken affidavits to the extent they go
> beyond opinions expressed in the experts' Rule 26 reports.

2006 WL 3484246, at * 7 (*citing Beasley v. U.S. Welding Serv., Inc.*, 129 Fed. Appx. 901, 902

(5th Cir. 2005)); *see also Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc.*, 1999 WL 135297, at * 4

(E.D. La. Mar. 11, 1999) (expert report discussing issues not included in initial report cannot be

considered "supplementary").

   The court agrees with defendants that the new opinions expressed in Dr. Ramsey's

Supplemental Affidavit are more than mere supplementation of his prior opinions, but are

entirely new opinions.  Specifically, Dr. Ramsey opines regarding other alternative causes of Ms.

Buxton's generalized brain damage, none of which is mentioned in his prior affidavits.  In

addition, Dr. Ramsey changed his opinion as to the number of arteries in which Ms. Buxton

supposedly experienced vasoconstriction.  Plaintiff has offered no reason why the opinions

expressed in Dr. Ramsey's Supplemental Affidavit were not included in his two prior affidavits.

Indeed, plaintiff's medical records were reviewed by Dr. Ramsey years ago, and her treating

12

physicians were also deposed years ago (in August and September 2004).  Yet plaintiff chose to wait until 5:00 p.m. the evening before defendants' final summary judgment briefing was due to submit the Supplementary Affidavit.   In addition, the court agrees with defendants that Dr. Ramsey's Supplemental Affidavit is an attempt to shore up his opinions in light of defendants' motion for summary judgment.

Plaintiff argues that the Supplementary Affidavit was timely filed as a response affidavit to the motion for summary judgment, pursuant to Rule 56(c) (which provides that "[t]he adverse party prior to the day of hearing [on the summary judgment] may serve opposing affidavits."). However, if plaintiff's position was the law, litigants could continue to file new expert affidavits and supplementary affidavits at any time right up until the day before any hearing the court may set on a motion for summary judgment.  As defendants correctly point out, this would eviscerate Rule 26's expert disclosure requirements, as well as courts' authority to enforce their own scheduling orders.  Notably, plaintiff has not cited one case in support of this argument - and, indeed, fails to address any of the cases cited in defendants' brief in support of the motion to strike, a number of which explicitly arise in the summary judgment context.  *See*, *e.g.*, *Williams v. Gonzales*, 2005 WL 3447885, at * 6 (E.D. Tex. Dec. 14, 2005); *Cleav*e, 2005 WL 1629750, at * 1; *Brumley*, 200 F.R.D. at 603; *see also Thompson v. Barnett*, 734 F.Supp. 751, 753 (S.D. Miss. 1989) (striking untimely expert reports filed in response to defense motion for summary judgment).  The court finds that this position is untenable.  Accordingly, having found that the Supplemental Affidavit contains new, rather than supplemental opinions, and that it was not served in a timely manner, the court must determine whether or not it should be stricken.

Rule 37(c)(1) provides: "A party that without substantial justification fails to disclose

13

information required by Rule 26(a) or 26(e)(1)...is not, unless such failure is harmless, permitted

to use as evidence at a trial, at a hearing, or on a motion any witness or information not so

disclosed." Failure to comply with the requirements of Rule 26(a) requires "automatic and

mandatory" exclusion of the proffered expert opinion pursuant to Rules 26 and 37(c)(1) where

plaintiff cannot show that the violation was either "justified or harmless."  *Musser v. Gentiva

Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004); *see also Avance*, 2006 WL 3484246, at * 6

(party failing to comply with Rule 26 "bears the burden to show that its actions were

substantially justified or harmless.").  Exclusion is also appropriate pursuant to Rule 16(b), which

"authorizes the district court to control and expedite pretrial discovery through a scheduling

order" and which gives the court "broad discretion to preserve the integrity and purpose of the

pretrial order," including the exclusion of evidence as a means of enforcing the pretrial order.

*Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990) (citations omitted).

  In deciding whether to exclude Dr. Ramsey's Supplemental Affidavit pursuant to Rule 16

or Rule 37(c)(1), the court must consider the following four factors: (1) the explanation for the

failure to comply with the rules; (2) the importance of the testimony; (3) the potential prejudice

in allowing the testimony; and (4) the availability of a continuance to cure any such prejudice.

*Geiserman*, 893 F.2d at 791; *Hamburger v. State Farm Mut. Auto Ins. Co.*, 361 F.3d 875, 883 (5th

Cir. 2004); *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996); *Avance*, 2006 WL

3484246, at * 6; *Shelter*, 1999 WL 135297, at * 4.

  First, as noted above, plaintiff has offered no explanation whatsoever for the failure to

timely disclose the opinions contained in Dr. Ramsey's Supplemental Affidavit.  Nor did plaintiff

seek an extension of time or a modification of the Scheduling Order from the court.  As for the

second factor - the importance of the testimony - assuming *arguendo* that Dr. Ramsey's

Supplemental Affidavit is important to plaintiff's case, the Fifth Circuit has stated that "the

importance of proposed [expert] testimony cannot 'singularly override the enforcement of local

rules and scheduling orders.'"   *Hamburger*, 361 F.3d at 883 (*citing Geiserman*, 893 F.2d at 792).

Third, with respect to potential prejudice, the Fifth Circuit has noted that a delay of even a few

weeks in disclosing expert testimony disrupts the court's schedule and the opponent's

preparation and is thus prejudicial.   *Geiserman*, 893 F.2d at 791; *see also Williams*, 2005 WL

3447885, at * 6 ("Disruption of the court's discovery schedule and the opponent's preparation

constitutes sufficient prejudice to militate in favor of the exclusion of [experrt] testimony.").

Here, plaintiff offered Dr. Ramsey's Supplemental Affidavit almost eight months after the

deadline for her expert reports and seven months after service of defendants' expert reports, not

to mention on the eve of defendants' final summary judgment briefing.   Finally, although a

continuance could potentially cure the prejudice by allowing defendants to depose Dr. Ramsey on

his Supplemental Affidavit, this would obviously result in additional delay and increase the

expense of defending this lawsuit.   *See Hamburger*, 361 F.3d at 883 (*citing Geiserman*, 893 F.2d

at 792).   Moreover, "[b]ecause of a trial court's need to control its docket, a party's violation of

the court's scheduling order should not routinely justify a continuance."   *Id.*   Otherwise, as the

Fifth Circuit reasoned in *Hamburge*r, "the failure to satisfy the rules would never result in

exclusion, but only in a continuance."   *Id.   See also Robbins v. Ryan's Family Steak Houses East,*

*Inc.*, 223 F.R.D. 448, 454 (S.D. Miss. 2004) (excluding supplemental expert testimony and

noting violation of scheduling order should not routinely result in continuance).

   Accordingly, based on the foregoing, the court is inclined to strike Dr. Ramsey's

Supplemental Affidavit.  However, for the sake of argument and to give plaintiff the benefit of the doubt (and because, as discussed below, even considering the Supplemental Affidavit on its merits, the court finds that summary judgment should be granted to defendants), the court will deny the motion to strike the Supplemental Affidavit and will consider it in its analysis on the motion for summary judgment.

Motion for Summary Judgment

Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  The moving party, however, need not negate the elements of the non-movant's case.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) *(citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to show with "'significant probative' evidence" that a genuine issue of material fact actually exists.  *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994) (citation omitted).  To overcome summary judgment, the non-movant may not rest on the pleadings, but must identify

specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case." *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257. "The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1996) (citation omitted). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence...will be insufficient" to defeat a properly supported motion for summary judgment.). "[C]onclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass*, 79 F.3d at 1429 (citation omitted). The non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

When deciding a motion for summary judgment, the evidence submitted by the nonmoving party is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the party opposing summary judgment. *Anderson*, 477 U.S. at 255. The district court, therefore, "must not resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (internal citation omitted). Summary judgment is improper where the court merely believes it unlikely that the nonmovant

will prevail at trial. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5ᵗʰ Cir.

1962). By contrast, summary judgment for the moving party is only proper when a rational

factfinder, looking at the record as a whole, could not find for the nonmoving party. *Matsushita*,

475 U.S. at 587.

      "The mere existence of a disputed factual issue...does not foreclose summary judgment.

The dispute must be genuine, and the facts must be material." *Prof'l Mgrs., Inc. v. Fawer, Brian,*

*Hardy & Zatzkis*, 799 F.2d 218, 222 (5ᵗʰ Cir. 1986). "With regard to 'materiality,' only those

disputes over facts that might affect the outcome of the lawsuit under the governing substantive

law will preclude summary judgment. Factual disputes that are irrelevant or that are unnecessary

will not be counted." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5ᵗʰ Cir. 1987) (citation

omitted). Where "the summary judgment evidence establishes that one of the essential elements

of the plaintiffs' cause of action does not exist as a matter of law,...all other contested issues of

fact are rendered immaterial." *Topalian v. Ehrmanl*, 954 F.2d 1125, 1138 (5ᵗʰ Cir. 1992), *reh'g*

*denied*, 961 F.2d 215 (5ᵗʰ Cir. 1992).

<u>Analysis</u>

      Defendants are correct that, pursuant to the MDL's controlling orders excluding expert

causation opinions related to injuries other than stroke (including, specifically, cardiac injuries),

plaintiff can only avoid dismissal of this case if she can produce admissible expert testimony that

she had a stroke. *Taylor v. Pharmacia-Uphohn Co., LLC*, 2005 WL 3502052, at * 5 (S.D. Miss.

Dec. 19, 2005) ("A plaintiff cannot recover for any condition for which she has no expert

medical testimony to substantiate a causal link between the allegedly offending product and the

condition."); *Knight v. Armstrong Rubber Co.*, 1991 WL 532493, at * 4 (S.D. Miss. Apr. 18,

1991) ("Expert testimony will not salvage a plaintiff's case from summary judgment unless that testimony would be admissible into evidence.") (internal citations omitted).[20]

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training or education, may testify... if  "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  As established by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), a trial court acts as a "gatekeeper" to the admission of expert scientific testimony under Rule 702.  *See also Lott v. Rental Serv. Corp.*, 2006 WL 839558, at * 2 (S.D. Miss. Mar. 30, 2006) ("The Supreme Court's decision of *Daubert v. Merrell Dow Pharmaceuticals* imposes upon this court the obligation to 'perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue.'") (*citing Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997)).  This gatekeeping role means that the court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert,* 509 U.S. at 589; *see also Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003).[21]  In performing this inquiry, it is important

------

[20] Indeed, plaintiff does not dispute that she must come forward with admissible expert testimony that she had a stroke in order to avoid dismissal of her claims.

[21] Plaintiff argues that defendants cannot make a *Daubert* challenge because of the MDL court's previous *Daubert* ruling.  However, nothing in the MDL court's *Daubert* ruling precludes defendants from making a *Daubert* challenge to Dr. Ramsey's testimony.  Judge Rothstein ruled that there was sufficiently reliable scientific evidence that PPA caused ischemic stroke *generally*, whereas the issue before this court on this motion is whether there is sufficiently reliable scientific evidence that *plaintiff* suffered an ischemic stroke.  Plaintiff also argues that for purposes of this motion for summary judgment, the court must accept the statements in Dr. Ramsey's affidavit as true.  However, it is well-established that documentary evidence which is

to keep in mind that "[j]udges...should not exclude expert testimony simply because they disagree with the conclusions of the expert....The test is whether or not the reasoning is scientific and will assist the jury.  If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony*."  In re PPA Products Liab. Litig.*, 289 F.Supp.2 d at 1249 (*citing Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-31 (9th Cir. 1998)).

   As noted by the Supreme Court in *Brown v. Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993), "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  Thus, numerous courts have rejected expert opinions on the basis that they are inconsistent with the underlying facts and data, not supported by sufficient facts or data, and/or are conclusory.  *See, e.g., McNabney v. Lab. Corp.,* 153 Fed. Appx. 293, 295 ("*Viterbo* answered negatively 'the question whether it is so [merely] if an expert says it is so'") (5th Cir. Nov. 9, 2005) (*quoting Viterbo v. Dow Chem. Co.*, 8326 F.2d 420, 421 (5th Cir. 1987)); *Burleson v. Texas Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (affirming exclusion of expert testimony "based on speculation, guesswork, and conjecture");

---

not admissible at trial is not admissible during the summary judgment phase of litigation.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992).  Indeed, Rule 56 requires the plaintiff to come forward with admissible evidence of causation to survive summary judgment.  *See, e.g., Knight,* 1991 WL 532493, at * 4; *Shelter Ins. Cos. v. Ford Motor Co.*, 2006 WL 3780474, at * 2 (5th Cir. Dec. 18, 2006) (admissibility of expert testimony governed by same rules at both trial and summary judgment) (*citing First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136-37 (5th Cir. 1996)).  As defendants point out, if plaintiff's position were the law, "defendants would never be able to exclude unreliable expert testimony or obtain summary judgment and *Daubert* would be relegated to the ash heap."  Fortunately, plaintiff's position is not the law.  As discussed above, Rule 702 and *Daubert* both require that this court determine whether Dr. Ramsey's testimony is relevant and reliable.

*Chambers v. Exxon Corp.*, 2001 WL 43538, at * 2 (5th Cir. Jan. 5, 2001) (affirming exclusion of expert testimony and summary judgment for defense where plaintiff's expert opinions that benzene exposure caused his injury were not supported by reliable data and thus were based only on the *ipse dixit* of the experts); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (excluding speculative testimony as lacking scientific validity); *see also Edmonds v. Illinois Cent. Gulf R.R. Co.*, 910 F.2d 1284, 1287 (5th Cir. 1990) ("Without more than credentials and a subjective opinion, an expert's testimony that it is so is not admissible.") (internal quotation omitted); *Kemp v. Biolab, Inc.*, 2005 WL 1595669, at * 3, 7 (S.D. Miss. June 22, 2005) (excluding expert testimony and granting summary judgment where expert's opinion was in direct contradiction to the underlying facts in the case); *Taylor v. Pharmacia-Upjohns Co., LLC*, 2005 WL 3502052, at * 5 (S.D. Miss. Dec. 19, 2005) (excluding Dr. Ramsey's expert testimony because "there is lacking in the record any evidence suggesting any medical or scientific basis for Dr. Ramsey's opinion other than his statement that it is so."); Report and Recommendation, *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, slip op. at 13-15 (S.D.N.Y. Apr. 9, 2004) (granting defense summary judgment and excluding expert testimony of Dr. Ramsey presented in affidavit in opposition to motion that Rezulin caused plaintiffs' cardiac injuries, because there was "too great an analytical gap between the data and the opinion proffered") (internal quotation omitted), *objections overruled by* 2004 WL 1161248 (S.D.N.Y. May 25, 2004).

Defendants argue that Dr. Ramsey's opinion that plaintiff suffered an ischemic stroke is conclusory *ipse dixit*, unsupported by any objective evidence in plaintiff's medical records, in contradiction to the opinions and testimony of both of her treating physicians, and not scientifically valid or reliable, and therefore, pursuant to Rule 702 and *Daubert*, it should be

excluded.  Although plaintiff's medical records were discussed earlier, they will be briefly summarized below.

Plaintiff's February 22, 1999 perfusion lung scan result was read to be "consistent with a high probability of pulmonary embolus."[22]  Plaintiff underwent three separate CT Head Scans (on February 21, 22, and 25, 1999), all of which were negative, meaning that no abnormalities were seen and there was no evidence of bleeding or stroke.   In addition, four EEGs were performed on plaintiff and the impressions were described as consistent with diffuse cerebral dysfunction due to anoxic/hypoxic encephalopathy.

In addition, Dr. Leader, plaintiff's treating cardiologist, concluded at the time of the event and testified at his deposition in this case that a pulmonary embolism caused plaintiff's cardiac arrest, resulting in prolonged CPR during which time plaintiff's brain was deprived of oxygen, and, subsequently, hypoxic encephalopathy (*i.e.*, generalized brain damage).  Dr. Leader testified that plaintiff's symptoms in the week leading up to her adverse event, which included chest pain and shortness of breath, are common symptoms of pulmonary emboli.  Likewise, Dr. Tanious, plaintiff's treating neurologist (who testified that he sees approximately 80 stroke patients a month) also concluded at the time of the event and testified at his deposition in this case that plaintiff incurred hypoxic/anoxic encephalopathy secondary to a cardiac event.  Dr. Tanious repeatedly testified that plaintiff had encephalopathy and did not have a stroke and that there was no evidence of vasospasm in plaintiff's medical records.

In her brief in opposition to the motion for summary judgment, Plaintiff has raised a

---

[22] Dr. Lawrence explained that at the time, the perfusion lung scan was the standard study used for initial diagnosis of pulmonary embolism.  He explained that it is not possible to diagnose pulmonary embolism on a clinical presentation alone.

number of issues with the medical records and with plaintiff's treating physicians' deposition testimony.  First, both Dr. Leader and Dr. Tanious testified that they had never seen a young, healthy, active person such as plaintiff sustain a pulmonary embolism.  Dr. Leader explained that the causes of pulmonary embolism are obesity, sedentary lifestyle, or a traumatic event causing a clot, and that plaintiff did not have any of these risk factors.[23]  However, as discussed above, Dr. Leader unequivocally testified that plaintiff had a pulmonary embolism.   Dr. Tanious said that he was not aware during his treatment of Ms. Buxton that she had suffered a pulmonary embolism, but that he believed that pulmonary embolism was a risk factor for developing cardiac arrest that can then lead to hypoxic encephalopathy.

Another issue raised by plaintiff is that neither Dr. Leader nor Dr. Tanious knew that plaintiff had taken Tavist-D when she was under their care at SCRMC.  Dr. Leader testified that had he been told, he would not have included PPA on his differential diagnosis at that time because he "normally would not have associated that with an acute event at the time.  Since then, there's been a lot more information that's come around."  However, the information Dr. Leader was referring to was information about PPA causing dysrhythmias, or abnormal heart rate.  He was not aware of the seminal Yale study linking PPA with hemorrhagic strokes, the so-called "Yale Hemorrhagic Stroke Project," published in 2000.

Dr. Tanious did testify that had he known that plaintiff had taken Tavist-D, he would have included PPA on his differential diagnosis.  Dr. Tanious explained, however, that he would have done so only to be sure that he was being inclusive of everything that could possibly have

---

[23]   In addition, Dr. Tanious testified that the best test for detecting a pulmonary embolism is an arteriogram, which was not performed on plaintiff.

causd the problem, not because he had scientifically reliable evidence that PPA caused either strokes or hypoxic encephalopathy.  Indeed, Dr. Tanious testified that he believed that PPA might cause cardiac arrhythmia and hypertension, not stroke.  At most, Dr. Tanious was willing to say that if all other causes could be excluded, and knowing that plantiff had ingested PPA, it would be his opinion that PPA caused or contributed to the cardiac arrest that plaintiff had suffered.  He also testified, however, that he could not exclude all other causes because he is not a cardiologist.  Dr. Tanious testified that he did not have an opinion as to whether PPA did, in fact, cause plaintiff's event.  At any rate, this argument by plaintiff misses the mark.  Regardless of whether or not they knew plaintiff had taken PPA, both doctors were unequivocal that they did not believe plaintiff had suffered a stroke.

In addition, plaintiff has pointed to Dr. Tanious' testimony that although a CT scan can rule out a large obvious stroke in certain areas of the brain, it does not exclude the possibility of a small stroke in certain areas of the brain.[24]  However, this is a red herring.  Plaintiff and Dr. Ramsey contend that plaintiff suffered a massive ischemic stroke involving the vasoconstriction of more than one cerebral artery, and Dr. Tanious was clear that the CT scans "definitely" excluded the possibility of a "large obvious stroke."  Dr. Tanious also unambiguously testified: "I don't think that [plaintiff] ever had a stroke" and he testified that he was not aware of any evidence in plaintiff's records that she had vasoconstriction.

Plaintiff also points to Dr. Tanious' testimony that an EEG would not rule out the possibility of an ischemic stroke.  However, Dr. Tanious also testified again and again that he did

---

[24] Dr. Tanious explained that an MRI would be a more accurate test; however, an MRI was not ordered for plaintiff because she was on a ventilator.

not see any signs suggesting that plaintiff had an ischemic stroke and that he could state within a reasonable degree of medical certainty that plaintiff had anoxic encephalopathy, and *not* a stroke.

Thus, both of plaintiff's treating physicians were unequivocal that they believed (both at the time of the events in question and at their depositions) that plaintiff did not have a stroke - even now knowing that she ingested Tavist-D.  Dr. Ramsey's opinion to the contrary is based on the alleged association between PPA and stroke, and the new paragraph 6 in his Supplementary Affidavit purporting to rule out pulmonary embolism because of his belief that it is unlikely that plaintiff had one.  In her brief in opposition to the motion for summary judgment, plaintiff spends a great deal of time arguing that Ms. Buxton did not have a pulmonary embolism, and also arguing that neither Dr. Leader nor Dr. Tanious could be certain whether the pulmonary embolism occurred before or after the cardiac event or, if it did occur before the cardiac event, that it caused the cardiac event.  However, that is not the point.  As defendants correctly argue, it is not defendants who have the burden to prove that a pulmonary embolism was the cause of Ms. Buxton's cardiac arrest and resulting brain damage.  Rather, it is *plaintiff's* burden to come forward with scientifically reliable evidence that Ms. Buxton's brain damage was caused by a stroke.  No physician other than Dr. Ramsey - who is neither a cardiologist nor a neurologist, and was not plaintiff's treating physician- has opined that plaintiff's generalized brain injury was the result of a stroke.[25]  Dr. Ramsey does not acknowledge or attempt to explain these fundamental conflicts - even in his latest Supplemental Affidavit.  Nor does Dr. Ramsey identify those portions of the medical record that purportedly support his theory.

---

[25] Indeed, plaintiff's own expert, Dr. Howard Katz (board-certified in Physical Medicine and Rehabilitation, the Subspecialty of Spinal Cord Injury Medicine, and an Independent Medical Examiner), assessed plaintiff as having anoxic encephalopathy

Dr. Ramsey did not even attempt to rule out cardiac arrest as the cause of plaintiff's brain damage in the first two iterations of his expert report.  Finally, however, Dr. Ramsey added paragraph 6 to his Supplemental Affidavit, in which he expresses his opinion that it is highly unlikely that a pulmonary embolism formed which caused plaintiff's brain damage because plaintiff had no risk factors and because the lung perfusion test did not confirm the existence of this clotting.  Dr. Ramsey opined that even if there were a pulmonary embolism, it was highly likely that it formed after the ischemic stroke.  Dr. Ramsey also opined that plaintiff's brain damage was not caused by a spontaneous cardiac arrest because she did not have any risk factors, but rather, that after plaintiff suffered a dramatic decrease in blood supply to the brain, she sustained a massive ischemic stroke, and the brain then reacted in causing the heart to attempt to pump more blood into the brain, which "probably" resulted in ventricular fibrillation.  However, Dr. Ramsey does not cite to any evidence whatsoever in the record to support this theory.

Moreover, defendants have also provided the court with the May 17, 2006 affidavit of Dr. Don Antonio Bell, a board-certified diagnostic and invasive neuroradiologist specializing in the interpretation of images of the brain and spinal cord (and who also performs treatments in the central nervous systems for various diseases, including hemorrhagic and ischemic strokes).  Dr. Bell was retained by the defense as an expert witness.  Dr. Bell reviewed plaintiff's medical records, including her CT scans, as well as Dr. Ramsey's affidavit, and concurred with plaintiff's treating physicians that "although Ms. Buxton did sustain brain damage as a result of her cardiac arrest, she did not have a stroke."  Like Drs. Leader and Tanious, Dr. Bell distinguished stroke, a focal injury impacting a particular area or areas of the brain, from hypoxic encephalopathy, a diffuse injury impacting the entire brain.  Dr. Bell explained that each of the four CT scans

26

confirmed that plaintiff did not have a stroke because they did not provide evidence of a focal

injury or vasoconstriction:  "Instead, Ms. Buxton's CT Scans show evidence of a diffuse,

generalized hypoxic encephalopathy over her entire brain."  In addition, Dr. Bell opined that

plaintiff's EEG readings were also consistent with generalized brain damage as opposed to

stroke.

Dr. Bell also stated that he was unable to find any evidence in plaintiff's medical records

or her radiological film to support Dr. Ramsey's theory that plaintiff had an ischemic stroke

caused by vasoconstriction.  Moreover, Dr. Bell stated: "Dr. Ramsey's theory - that every one of

Ms. Buxton's cerebral arteries constricted at the same moment and at the same magnitude

causing uniform injury over her entire brain - is not scientifically plausible or reliable.  I have

cared for hundreds of stroke patients and have never seen or heard of such an event."  Dr.

Ramsey's Supplemental Affidavit does not address any of Dr. Bell's criticisms.

In addition, as defendants argue, the literature Dr. Ramsey cites in his expert report

supports the theory that PPA can cause a focal stroke, vasoconstriction, or blood pressure spikes

in the general population - *not* that PPA can cause simultaneous, global cerebral

vasoconstriction, vasoconstriction of multiple arteries leading to global brain damage, or

anything like the type of event experienced by plaintiff.  Indeed, the MDL expert opinions and

*Daubert* decision all dealt with focal injuries.   The Fifth Circuit has summarized the five-factor

test proffered by the Supreme Court in *Daubert* for determining whether an expert's

methodology is scientifically valid or reliable to include, *inter alia*, "whether the theory has been

submitted for publication and peer review" and "whether and to what degree the theory has been

accepted within the scientific community."  *Moore*, 151 F.3d at 275; *see also Daubert*, 509 U.S.

27

at 593-95.  Plaintiff and Dr. Ramsey have made no attempt to demonstrate that Dr. Ramsey's theory is based on valid scientific reasoning.  Without such a showing, "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Chambers*, 2001 WL 43538, at * 2 (*quoting Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

Finally, the court notes that in the three affidavits offered by Dr. Ramsey, his opinion as to what exactly happened to plaintiff keeps changing.  In his first affidavit, Dr. Ramsey stated that PPA "caused a massive vasoconstriction of all arteries...."  In the second affidavit, Dr. Ramsey changed his opinion to state that PPA "caused or contributed to the cause of a massive vasoconstriction of arteries...."  In the Supplemental Affidavit, Dr. Ramsey states that PPA "caused or contributed to the cause of a massive vasoconstriction of more than one (1) of the cerebral arteries...."  These shifting statements underscore the lack of reliability of Dr. Ramsey's opinion.

Based on the foregoing, the court finds that Dr. Ramsey's opinions expressed in his original affidavit and his Supplemental Affidavit are not sufficiently reliable and, pursuant to Rule 702 and *Daubert*, they should be excluded.  As noted earlier, in the absence of any expert testimony demonstrating that plaintiff had an ischemic stroke, defendants are therefore entitled to summary judgment.  *See*, *e.g.*, *Taylor*, 2005 WL 3502052, at * 5; *Knight*, 1991 WL 532493, at * 4; *see also Chambers*, 2001 WL 43538, at * 2 (affirming district court's granting of summary judgment to defendants where plaintiff's causation experts were excluded under Rule 702).

IT IS, THEREFORE, ORDERED AND ADJUDGED that defendants' motion to strike [ # 101] is denied, and that defendants' motion for summary judgment [ # 58] is granted.  Plaintiff's claims against defendants are dismissed with prejudice.

28

IT IS FURTHER ORDERED AND ADJUDGED that all other pending motions, if any, are dismissed as moot.

SO ORDERED and ADJUDGED on this, the 1st day of August, 2007.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE